IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ALTER TRADING CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:16-cv-01397-RLW |
| | ) |
| DERRICK BRION, | ) |
| | ) |
| Defendant. | ) |

## ORDER GRANTING PRELIMINARY INJUNCTION

### FINDINGS OF FACT

1. Plaintiff Alter Trading Corporation ("Alter") is in the business of selling, purchasing, and processing scrap metal and automobile parts.

2. Alter has various scrap yards across the country, including one located at 1753 Beloit Avenue, Janesville, Wisconsin 53546 (the "Facility").

3. At all relevant times, Alter took precautionary measures to secure and protect its Confidential Information (as defined below), customer contacts, goodwill, and employment relationships, including through the use of Confidentiality, Noncompetition, and Nonsolicitation Agreements, as a condition of employment.

4. Alter hired Defendant Derrick Brion ("Brion") on or about May 14, 2012 to work as an Account Executive Trainee.

5. Initially Brion worked for Alter at its facility located at 3532 White Avenue, Eau Claire, Wisconsin 54703 (the "Eau Claire Facility").

6. On or about December 20, 2012, Brion was promoted to Account Executive, given a raise and relocation expenses, and relocated to the Janesville Facility.

1

7. As an Account Executive, Brion's primary duties were to "purchase ferrous and non-ferrous scrap from existing industrial accounts and suppliers," "maintain contact with existing industrial accounts and suppliers to maintain consistent inbound scrap flow within budgeted guidelines," and "solicit and develop new industrial, dealer, and suppliers accounts in northern region."

8. Brion had contact with Alter's Customers and Confidential Information at Alter's Janesville Facility, Eau Claire Facility, and other Alter yards in southern Wisconsin, northern Illinois, and northern Iowa.

9. In light of the foregoing, throughout his employment with Alter as an Account Executive, Brion developed relationships and goodwill with Alter's Customers.

10. Some of Alter's Customers traveled as far as 200 miles to purchase scrap metal from, sell scrap metal to, and/or have scrap metal processed by Alter at the Janesville Facility and throughout the southern Wisconsin, northern Illinois, and northern Iowa regions.

11. In addition, Brion traveled upwards of 200 miles to service and entertain Alter Customers.

12. Additionally, in his position with Alter, Brion contributed to and received Alter's Confidential Information, including but not limited to, scrap processing techniques; purchasing, marketing and selling practices; know how; computer programs; the identity of Customers and potential Customers and the particular needs and requirements of Customers; Customer lists; Customer histories and records; personnel information; financial information; and confidential and proprietary information of Customers and other third parties received by Alter.

13. As a condition of Alter hiring Brion, Brion executed the Confidentiality, Noncompetition, and Nonsolicitation Agreement on May 1, 2012 (the "Agreement").

14. In the Agreement Brion acknowledged, among other things:

> WHEREAS, Company has through its research, creativity, and experience, developed and acquired valuable Confidential Information; and
>
> WHEREAS, as a result of Employee's position with Company, Employee contributes to, receives, or possesses such Confidential Information; and
>
> WHEREAS, Company will suffer irreparable harm if Employee makes any unauthorized disclosure or communication thereof to any third party or makes any use of such Confidential Information wrongfully or in competition with Company…

(Agreement, Third, Fourth and Fifth Recitals).

15. Brion also acknowledged and agreed, "Employee will have contact with Company's customers and may develop relationships with them that could be used against the interests of Company but for the limitations set forth herein." (Agreement, Sixth Recital).

16. The "Confidential Information" provision of the Agreement provides, in relevant part:

> **Nondisclosure**. Employee shall, during the course of Employee's employment and at all times subsequent to Employee's employment, hold in strictest and total confidence all Confidential Information. Employee will at no time, without prior written authorization by Company, disclose, assign, transfer, convey, communicate, or use for the benefit of any person or entity other than Company any Confidential Information, nor shall Employee permit any other person or entity to use Confidential Information in competition with Company.

(Agreement, ¶ 1 (a)).

> **Definitions.** As used herein, the term **"Confidential Information"** shall mean any information proprietary to Company and not generally known, including without limitation Trade Secrets; Inventions; technology, whether now known or hereafter discovered; information pertaining to research, development, techniques, engineering, purchasing, marketing, selling, accounting, licensing, know how, processes, products, equipment,

3

devices, models, prototypes, computer hardware, computer programs and flow charts, program code, software libraries, databases, formulae, compositions, discoveries, cost systems, and pending business transactions; the identity of customers and potential customers and the particular needs and requirements of customers; customer lists; customer histories and records; personnel information; financial information; and confidential and proprietary information of customers and other third parties received by Company.

As used herein, the term **"Trade Secret"** shall mean information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, or process, that: (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

...

(Agreement, ¶ 1 (b)).

17. Brion was also required to return the Confidential Information to Alter:

**Return of Confidential Information**. Upon termination of Employee's employment with Company or at any other time upon Company's request, Employee shall deliver promptly to Company all originals and all copies (including photocopies, facsimiles, and computer or other means of electronic storage whether now known or hereafter discovered) of all documents and other materials relating in any way to Confidential Information or the business of Company. Employee will not make or retain any copies of the foregoing and will so represent to Company upon Employee's termination of employment.

(Agreement, ¶ 1(c)).

18. The noncompetition provision in the Agreement provides:

**Noncompetition**. During Employee's employment and for a period of two (2) years after the termination of Employee's employment for any reason, Employee shall not, within 200 miles of any location where Employee worked for or provided services for Company, directly or indirectly, own, manage, operate, control, advise, be employed by, or materially participate in, or be

4

materially involved in any manner with the ownership, management, operation, or control of any business or entity that competes with the business then conducted by Company or any of its affiliated companies or subsidiaries.

(Agreement, ¶ 2(a)).

19. The customer nonsolicitation provision provides:

**Non-Solicitation of Customers**. During Employee's employment, and for a period of two (2) years after the termination of Employee's employment for any reason, Employee shall not, individually or collectively, as a participant in a partnership, sole proprietorship, corporation, limited liability company, or other entity, or as an operator, investor, shareholder, partner, director, employee, consultant, manager, sales representative, independent contractor or advisor of any such entity, or in any other capacity whatsoever, either directly or indirectly:

i. solicit or accept any business from any Customer or assist any other entity in soliciting or accepting any business from any Customer; or

ii. request or advise any Customer to withdraw, curtail, or cancel any of such Customer's business or other relationships with Company.

As used in this section, "**Customer**" shall mean any person or entity with whom Employee had substantial contact by reason of Employee's employment with Company, and that Company (a) rendered any services to, or (b) solicited the business of such person or entity, whether or not any services were rendered to such person during Employee's employment.

(Agreement, ¶ 2(b)).

20. Brion acknowledged and agreed that the foregoing restrictive covenants were reasonable and necessary to protect Alter's legitimate business interests:

**Reasonableness of Restrictions.** Employee acknowledges that Employee's covenant not to compete unfairly is necessary to protect the legitimate business interests of Company, and that irreparable harm and damage will be done to Company in the event that Employee competes unfairly with Company. Employee further acknowledges that it would cause substantial harm and detriment to Company, including loss of office continuity and

5

return on investment made in training employees, additional training and hiring costs for replacement employees, potential loss of referral sources and customers, and potential loss of Confidential Information, if employees of Company were hired or lured by Employee to a business similar to that of Company.

(Agreement, ¶2 (d)).

21. Brion also acknowledged Alter's right to injunctive relief.

**Remedies.** Employee acknowledges that Employee's threatened or actual breach of any of the terms hereof will result in immediate, irreparable harm and injury to Company, not adequately compensable by monetary relief. As a result, Company shall have the right to enforce the provisions hereof by injunction, specific performance or other equitable relief, as well as through all other equitable and/or legal remedies to which Company may be entitled.

(Agreement, ¶ 4).

22. Brion executed the Agreement freely and under no coercion or duress. The Agreement was supported by valid consideration, in that executing the Agreement was a requirement for Alter to hire Brion.

23. Prior to resigning from Alter, Brion met with John Gralewski, CEO of CIMCO, for lunch on two occasions May of 2016 and discussed a job at CIMCO.

24. On May 11, 2016, Brion requested a copy of his Agreement from Alter's Human Resources department.

25. At the second of Brion's lunch meetings with Mr. Gralewski, Brion gave Mr. Gralewski a copy of his Agreement. Mr. Gralewski told Brion he was not worried about the Agreement. Mr. Gralewski further told Brion that he did not believe in the use of noncompetition agreements.

26. On May 26, 2016, Brion signed an At-Will Employment Agreement with CIMCO (the "CIMCO Agreement").

6

27. On May 27, 2016, Brion informed Alter he would be voluntarily terminating his employment.

28. When Brion resigned, Brion told his supervisor, Randy Bollig, he was not sure what he was going to do. At that time, however, Brion had already accepted a position with CIMCO.

29. June 10, 2016 was Brion's last day of employment.

30. Brion's first day of work at CIMCO was June 13, 2016, and Brion has been continuously employed by CIMCO since that time.

31. CIMCO is also in the business of selling, purchasing, and processing scrap metal. CIMCO operates in direct competition with Alter. CIMCO prides itself on its ability to service accounts "within a five-state area" from its facilities in Illinois and Wisconsin.

32. Upon his hiring at CIMCO, Brion began actively soliciting Alter's Customers on behalf of CIMCO.

33. Brion has identified 18 Alter Customers with whom he worked during his employment at Alter and that he has contacted on CIMCO's behalf since he left Alter.

34. Moreover, Brion has purchased scrap from some of the 18 Alter Customers on CIMCO's behalf.

35. On August 1, 2016, Alter, through legal counsel, sent Brion a letter instructing him to cease and desist from violating the Agreement; however, Brion never responded to Alter's letter and Brion continued to violate his Agreement.

36. CIMCO continues to pay Brion his full salary and benefits, even during the period the temporary restraining order was in place. Further, Brion understands that CIMCO will pay his salary and benefits in the event the Court enters a preliminary injunction.

37. The CIMCO Agreement also provides that CIMCO will pay Brion a severance in an amount equal to his salary through May 31, 2018 in the event his employment is terminated without cause.

**CONCLUSIONS OF LAW**

**I.  Legal Standard**

To obtain a preliminary injunction, Alter must prove: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury granting the injunction will inflict on other parties litigant; (3) the probability of success on the merits; and (4) the public interest. *Safety-Kleen Sys., Inc. v. Hennkens*, 301 F.3d 931, 935 (8th Cir. 2002).

**II.  There is a threat of irreparable harm**

It is not necessary to show actual damage has occurred in order to obtain injunctive relief. *Ashland Oil v. Tucker*, 768 S.W.2d 595, 601 (Mo. Ct. App. 1989). In cases involving covenants not to compete, Missouri courts have held that if the covenant is lawful and the opportunity exists for influencing a plaintiff's customers to its disadvantage, enforcement is appropriate. *Id.*; *Osage Glass, Inc.*, 693 S.W.2d at 75. "If the covenant is lawful and the opportunity for influencing customers exists, enforcement is appropriate." *Safety-Kleen Sys.*, 301 F.3d at 935.

Here, Brion has been working for CIMCO, a competitor of Alter. Brion has admittedly solicited business from at least 18 Alter Customers on behalf of his new employer, CIMCO, in direct violation of his Agreement, and has purchased scrap from some of those 18 Alter Customers. Brion, through CIMCO, is also using the Customer relationships he developed at Alter in competition with Alter by doing business with the very same Customers for CIMCO, in violation of the Agreement. The evidence introduced at the preliminary injunction hearing

demonstrates the opportunity for Brion to continue soliciting Alter's Customers; therefore, Brion poses a threat of causing irreparable injury to Alter.

### III. Probability of Success on the Merits

The Agreement contains clauses prohibiting Brion from: (a) being employed by any business or entity that competes with Alter within 200 miles of any location where Brion worked for or provided services for Alter during Brion's employment with Alter and for a period of two years thereafter; and (b) soliciting or accepting any business from any Alter Customer during Brion's employment with Alter and for a period of two years thereafter. (Agreement, ¶¶ 2(a)-(b)). Brion has admittedly breached both of these provisions. Further evidence deduced at the preliminary injunction hearing supports the proposition that Brion has breached these provisions of the Agreement. Alter has therefore established a probability of success on the merits of its claim that Brion breached these provisions.

### IV. Balance of Harms Supports Entry of a Preliminary Injunction

The harm to Alter if Brion is not restrained from violating the Agreement is greater than the harm to Brion if restrained. If he is not restrained, Brion (with CIMCO) will continue to compete for business with Alter in violation of the Agreement, exploiting his position as a former Account Executive with Alter and exploiting his relationships and reputation in the market while he was Alter's employee. As discussed above, this competition is exactly what Alter sought to avoid when it made Brion's employment contingent upon his signing the Agreement—a contingency to which Brion agreed. Further, this competition will cause harm to Alter from the loss of goodwill, business reputation, and sales.

By contrast, the harm to Brion would be much less severe. Brion acknowledged Alter's "need for the protection afforded [in the Agreement] is greater than any hardship [Brion] might experience by complying with the terms set forth therein." (Agreement, ¶ 2(d)). Brion will

9

continue to be paid his regular salary and benefits by CIMCO throughout the entry of a preliminary injunction (and thereafter in the event his employment is terminated). Moreover, requiring Brion to live up to his obligations will not impose any undue hardship on him. He was compensated for his work at Alter and received monetary and other benefits. There should be no hardship or inequity in requiring an individual to honor the bargain he struck after he has willingly accepted the substantial contractual benefits. *See Osage Glass,* 693 S.W.2d at 75; *Ballesteros v. Johnson,* 812 S.W.2d 217, 222 (Mo. App. 1991). The injunction will not deprive Brion of his ability to earn a living. It merely will preclude him from disclosing Alter's Confidential Information, and for a period of 2 years from competing within 200 miles of the Janesville Facility and from soliciting Alter's Customers.

**V.     Public Interest**

The Court concludes that this is a matter between private parties and does not implicate the public interest.

Accordingly,

IT IS HEREBY ORDERED THAT Plaintiff Alter Trading Corporation's Application for a Preliminary Injunction is **GRANTED**. Defendant Derrick Brion is hereby:

(A)     Enjoined from performing any work or providing any services to CIMCO Resources, Inc. and any of its subsidiaries and affiliates, including CIMCO Recycling Sterling, Inc., in any capacity that involves the selling, purchasing, and/or processing of scrap metal and/or automobile parts, within 200 miles of Alter's facility located at 1753 Beloit Avenue, Janesville, Wisconsin 53546.

(B)     Enjoined from providing, disclosing, disseminating, or using any of Alter's confidential, proprietary, and/or trade secret information.

(C) Enjoined from soliciting or accepting any business from any person or entity with whom Brion had substantial contact by reason of Brion's employment with Alter, and that Alter rendered any services to.

(D) Pursuant to Rule 65(d)(2) of the Federal Rules of Civil Procedure, this Order shall be binding on those persons in active concert or participation with Brion who receive actual notice of the Order by personal service or otherwise.

**IT IS SO ORDERED.**

DATED: September 20, 2016

*Ronnie L. White*
RONNIE L. WHITE
UNITED STATES DISTRICT JUDGE